*Tagged opinion*



**ORDERED in the Southern District of Florida on May 13, 2024.**

**Laurel M. Isicoff, Judge**
**United States Bankruptcy Court**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA

| | |
|---|---|
| IN RE: | CASE NO.  19-16355-LMI |
| AMERICA-CV STATION GROUP, INC., | Chapter 11 |
|            Debtor. | |
| _____/ | |
| OMAR ROMAY, Liquidating Trustee, | ADV. CASE NO. 21-01059-LMI |
|            Plaintiff, | |
| vs. | |
| MEDIASET ESPAÑA COMUNICACIÓN, S.A., | |
|            Defendant. | |
| _____/ | |

**ORDER ON MOTIONS FOR SUMMARY JUDGMENT RELATING
TO PERSONAL JURISDICTION**

This matter came before the Court[1] upon the *Defendant's Motion for Partial Summary Judgment Based Upon Lack of Personal Jurisdiction* (ECF #175) ("Mediaset's Motion") filed by Defendant, Grupo Audiovisual Mediaset España Comunicación, S.A.U. (f/k/a Mediaset España Comunicación, S.A.) ("Defendant" or "Mediaset") and *Liquidating Trustee Omar Romay's Motion for Summary Judgment and Incorporated Memorandum of Law* (ECF #176) ("Liquidating Trustee's Motion") filed by Plaintiff Omar Romay, Liquidating Trustee for the Liquidating Trust of America CV-Station Group, Inc. ("Plaintiff" or the "Liquidating Trustee"). The Court has considered Mediaset's Motion, the Liquidating Trustee's Response[2], Mediaset's Reply[3], the Liquidating Trustee's Motion, Mediaset's Response[4], and the Liquidating Trustee's Reply[5].

This action is brought by the Liquidating Trustee appointed pursuant to the terms of a confirmed plan of reorganization seeking to avoid and recover as a fraudulent transfer a $10 million pre-petition payment made by America CV-Station Group, Inc. ("America CVSG" or "Debtor") to Mediaset. In Mediaset's Motion, Mediaset argues that this Court lacks personal jurisdiction over it and accordingly seeks entry of summary judgment in its favor. In the Liquidating Trustee's Motion, the Liquidating Trustee argues that this Court does have

---

[1] The Court advised the parties before the start of the trial of this matter that the Court was denying the *Defendant's Motion for Partial Summary Judgment Based Upon Lack of Personal Jurisdiction* and granting the Liquidating Trustee's Motion (defined hereinafter) with respect to personal jurisdiction, and that a written memorandum decision on the motions for summary judgment relating to personal jurisdiction would be issued by the Court after the trial.

[2] *Liquidating Trustee Omar Romay's Omnibus Response to Defendant's Three Motions for Summary Judgment* (ECF #182) ("Liquidating Trustee's Response").

[3] *Mediaset's Reply in Support of Its Three Motions for Partial Summary Judgment* (ECF #187) ("Mediaset's Reply").

[4] *Defendant Mediaset's Opposition to Plaintiff's Motion for Summary Judgment* (ECF #183) ("Mediaset's Response").

[5] *Liquidating Trustee Omar Romay's Reply in Support of His Motion for Summary Judgment* (ECF #188) ("Liquidating Trustee's Reply").

personal jurisdiction over Mediaset and seeks entry of partial summary judgment in its favor on the issue of personal jurisdiction. The Court finds that the Liquidating Trustee has met his burden on summary judgment to establish personal jurisdiction over Mediaset with respect to the relief sought in the Complaint.[6] Therefore, for the reasons stated below, the Court finds that it has personal jurisdiction over Mediaset and therefore Mediaset's Motion is DENIED and the Liquidating Trustee's Motion is GRANTED IN PART.

## PROCEDURAL HISTORY

On May 14, 2019, America CVSG filed a voluntary petition in the United States Bankruptcy Court for the Southern District of Florida (the "Bankruptcy Court") for relief under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") under Case No. 19-16355-BKC-AJC (the "Main Case"). Three other companies affiliated with the Debtor also filed for bankruptcy: Caribevision Holdings, Inc. under Case No. 19-16359-BKC-AJC, America-CV Network, LLC under Case No. 19-16977-BKC-AJC, and Caribevision TV Network, LLC under Case No. 19-16976-BKC-AJC. Caribevision Holdings, Inc., America-CV Network, LLC, and Caribevision TV Network, LLC (collectively the "Affiliated Debtors").

Before the bankruptcy cases were filed, the Romay Parties[7] on the one hand and America CVSG and Affiliated Debtors on the other were involved in extensive litigation (the "Romay Litigation") which resulted in a claim in the

---

[6] *Louis Vuitton Malletier, S.A. v. Mosseri,* 736 F.3d 1339 (11th Cir. 2013).
[7] Defined in the Plan (defined hereinafter) as: Omar Alejandro Saul Romay, Okeechobee Television Corp., Promisa, Inc., Sherjan Broadcasting, Inc., Telecenter, Inc., and America Teve Network, Inc.

3

amount of $12,919,740.88 (the "Romay Claim")[8] filed by the Romay Parties in the respective bankruptcy cases. During the chapter 11 cases the Debtor, the Affiliated Debtors, and the Romay Parties settled the Romay Litigation and that settlement (the "Romay Settlement") became an integral part of the Debtor's *Chapter 11 Plan of Reorganization Proposed by America-CV Station Group, Inc.* (Main Case ECF #125)[9] (the "Plan"). The Plan provided that the Romay Claim would be satisfied, in part, by assignment to a Liquidating Trust of a fraudulent conveyance action to recover payment of the $10 million pre-petition payment to Mediaset (the "Transfer").

The parties agree that the personal jurisdiction dispute can be resolved on summary judgment. The facts set forth below, unless otherwise noted, have not been disputed.

Mediaset is a Spanish company with its principal place of business in Madrid, Spain, where it conducts the vast majority of its business, focusing for the most part on television broadcasting. Mediaset operates primarily outside the United States. In 2008, Mediaset purchased a minority interest in Pegaso Television, Inc. ("Pegaso"), a Delaware corporation. Pegaso owned a minority interest in Caribevision Holdings, Inc. ("Caribevision")[10], also a Delaware corporation. Caribevision in turn owned stock in America CVSG which collectively operated television and radio stations in the United States, including

---

[8] Defined in the Plan (defined hereinafter) as: "the following joint and several claim filed by the Romay Parties in the amount of $12,919,740.88: (i) Claim No. 3-1 in the Caribevision Holdings Case, (ii) Claim Nos. 9-1 and 11-1 filed in this Chapter 11 Case, (iii) Claim No. 20-1 filed in the America-CV Network Case, and (iv) Claim No. 1-1 in the Caribevision Case."
[9] The Court cites entries on the Main Case docket as "Main Case ECF #".
[10] At some point after March 9, 2017, Caribevision changed its name to America Teve Holdings, Inc. The Court will refer to Caribevision as Caribevision even if the period to which the Court is referring Caribevision's corporate name was America Teve.

Puerto Rico (collectively the "Broadcast Businesses"). Caribevision itself did not have operations.

When Mediaset[11] purchased the stock in Pegaso, two Mediaset employees were appointed to Caribevision's six-member board, Angel Santamaria Barrio ("Santamaria") and Ana Cristina Castilla. In addition, Mediaset designated Santamaria to serve as an employee of Caribevision; in that capacity Santamaria worked in "treasury and all the financial matters" and, according to Marcell Felipe, in-house counsel for the Debtor and Affiliated Debtors, at some point Santamaria served as CFO (of which entity or all, or when, was not clear from the deposition testimony).[12] In fact, Santamaria lived in Miami for several years while working on behalf of Mediaset for Caribevision.

At the time Mediaset purchased its interest in Pegaso, Caribevision owned 50% of America CVSG and Omar Romay, in his individual capacity, together with some of the other Romay Parties owned the other 50%. Romay was operating the Broadcast Businesses but the relationship soured.

In 2011, Mediaset, together with other entities holding direct or indirect interests in the Broadcast Businesses, sued the Romay Parties and others (the "First Romay Litigation"). In November 2015, a $58 million verdict was entered for Caribevision, Mediaset and others against Romay and other defendants. Believing an upcoming FCC auction would yield sufficient proceeds that, even after accounting for the $58 million verdict against Romay (the "Romay

---

[11] Mediaset's corporate name when it first purchased its interest in the Broadcast Businesses was Gestavision Telecinco, S.A. The Court will refer to Mediaset as Mediaset even if, during the period to which the Court is referring, Mediaset's corporate name was Gestavision Telecinco.

[12] Two of the documents admitted into evidence at trial were 2018 and 2019 Sunbiz records of America CVSG identifying Santamaria as a director and treasurer of America CVSG.

Judgment"), there would be profits to be split between Caribevision and Romay, the parties agreed to a settlement in which the entity that owned the broadcast licenses used in the Broadcast Businesses would auction those licenses through an FCC auction, and the proceeds would be divided in a waterfall designed to pay the Romay Judgment to the successful plaintiffs and give some proceeds to Romay. Carlos Vasallo, a minority shareholder in Caribevision, took over control of the Broadcast Businesses.

This First Romay Litigation settlement was reflected in a Confidential Settlement Agreement (the "CSA" or "December 2015 Agreement"). The CSA provided that it would be governed and construed under the laws of the state of Florida and the courts in Miami-Dade County would have exclusive venue and jurisdiction over and disputes arising from or in connection with the CSA. Mediaset was a party to the CSA. The agreements reflected in the CSA were never realized because the proceeds of the FCC auction, approximately $13 million (the "Auction Proceeds"), were a fraction of what was anticipated (over $120 million).

Disputes arose almost immediately regarding how much, if any, Romay was entitled to any of the Auction Proceeds. Members of the Caribevision board of directors, including counsel, held extensive internal discussions regarding the FCC auction results, the Auction Proceeds, and whether Romay should receive any of it. Ultimately Caribevision decided that, based on its interpretation of the CSA, as well as that of its counsel, it would not distribute any Auction Proceeds to Romay.

On December 12, 2017, the Romay Parties initiated a lawsuit against America CVSG, Caribevision, Caribevision TV Network, LLC, Caribevision Station Group, LLC, and Spanish Broadcasting Systems, Holdings Group, Inc. seeking to recover what the Romay Parties claimed was their share of the Auction Proceeds and other damages (the "Romay State Court Litigation").

Even before the Romay State Court Litigation was filed, Mediaset had decided it wanted out of the Broadcast Businesses. After extensive negotiations, in March 23, 2018, Mediaset and Grupo Colte, S.A. de C.V. ("Grupo Colte") the largest shareholder of Pegaso, entered into the Share Purchase Agreement whereby Grupo Colte agreed to purchase Mediaset's shares in Pegaso (the "SPA"). Pursuant to the SPA, Grupo Colte purchased from Mediaset 21,594,787 shares of stock (the "Shares") in Pegaso.  According to Marcell Felipe, in-house counsel for the Broadcast Businesses, Santamaria was the primary negotiator of the deal locally, although in his declaration, Santamaria stated that the SPA was negotiated as well as executed by Mediaset in Spain. The SPA provided that Grupo Colte would pay Mediaset in Spain. The SPA provides that it is governed by U.S. law and courts in Miami-Dade County have the exclusive jurisdiction for resolving disputes under the SPA.[13]

Pursuant to the SPA, the purchase price for the Shares was $12,500,000.00, payable by Grupo Colte in three installments.   The first

---

[13] Mediaset claims it wanted the SPA to be governed by Spanish law and for Spanish courts to have exclusive jurisdiction over any disputes, but that Grupo Colte, a Mexican company, insisted on U.S. law and the courts of Miami-Dade County. Mediaset claims that, faced with the difficulty of finding an alternate buyer for stock in a closely held corporation, Mediaset agreed to the provision, believing disputes would be unlikely. Regardless of why Mediaset claims it agreed to these provisions, it voluntarily signed the SPA with these provisions included.

installment in the amount of $10,000,000.00 was due to Mediaset on April 23, 2018. This is the same date as the Transfer. The second installment, in the amount of $1,250,000.00 was due on March 31, 2019.  The third installment, also in the amount of $1,250,000.00, was conditioned on the outcome of the Romay State Court Litigation. On April 23, 2018, America CVSG sent a wire of $10,000,000.00 from its Iberia Bank account to Mediaset (the "Transfer"). According to Mediaset, it did not realize the funds were not sent by Grupo Colte until after Mediaset became aware of the alleged fraudulent transfer claim.

Upon the March 23, 2018 execution of the SPA, Mediaset was no longer involved in Pegaso, no longer had representatives on Caribevision's board, and Santamaria was no longer involved in the Broadcast Businesses.

Grupo Colte failed to make the second installment under the SPA and on February 20, 2020, Mediaset initiated suit in Miami-Dade County, Florida, against Grupo Colte claiming breach of the payment obligations under the SPA (the "Mediaset State Court Litigation").

When America CVSG, Caribevision, and the other Affiliated Debtors filed for bankruptcy, Mediaset had no remaining involvement in the Broadcast Businesses.  Moreover, Mediaset did not file a proof of claim in any of the bankruptcy cases, it was not scheduled as a creditor in any of the bankruptcy cases, and did not appear in any capacity in the bankruptcy cases.

On February 24, 2021, Omar Romay, acting as the duly appointed Liquidating Trustee, initiated this adversary proceeding by filing the Complaint[14]

---

[14] *Complaint to Avoid Transfer and to Recover Property* (ECF #1) (the "Complaint").

against Mediaset to avoid and recover the Transfer pursuant to 11 U.S.C. §§548 and 550.

## ANALYSIS

"Summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure and Rules 7056 and 9014 of the Federal Rules of Bankruptcy Procedure is appropriate when there exists no genuine issue of material fact and a decision may be rendered as a matter of law." *In re Ortega T.*, 573 B.R. 284, 290-91 (Bankr. S.D. Fla. 2017). "An issue of fact is 'material' if it is a legal element of the claim under the applicable substantive law which might affect the outcome of the case." *Allen v. Tyson Foods, Inc.,* 121 F.3d 642, 646 (11th Cir. 1997). In considering a motion for summary judgment, the Court must construe all facts and draw all reasonable inferences in the light most favorable to the nonmoving party. *Id.* The party moving for summary judgment has the burden of demonstrating that no genuine issue as to any material fact exists and that the movant is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). Once the moving party meets that burden, the burden shifts to the non-movant, who must present specific facts showing that there exists a genuine dispute of material fact. *Walker v. Darby*, 911 F.2d 1573, 1576 (11th Cir. 1990). "A mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party." *Id.* at 1577 (citing *Anderson v. Liberty Lobby*, 477 U.S. 242, 252 (1986)). At the summary judgment stage, the Court will not weigh the evidence or find facts; rather, the Court determines only whether there is sufficient evidence upon which a reasonable juror could find for

the nonmoving party. *Morrison v. Amway Corp.*, 323 F.3d 920, 924 (11th Cir. 2003). If there are no material facts in dispute, and only a purely legal question remains to be decided by the Court, then granting summary judgment is appropriate. *Anderson,* 477 U.S. at 247–48.

Both parties agree that there are no genuine issues of material fact and that the Court need only decide questions of law.  For the reasons set forth herein, the Court finds that it has personal jurisdiction over Mediaset.

## Personal Jurisdiction Generally

"Personal jurisdiction in bankruptcy cases is established under Federal Rule of Bankruptcy Procedure 7004, which provides for nationwide service of process." *Johnson v. Lovato (In re Jimenez)*, 627 B.R. 536, 544 (Bankr. S.D. Fla. 2021). Rule 7004(f) provides:

> **(f) Personal Jurisdiction**. If the exercise of jurisdiction is consistent with the Constitution and laws of the United States, serving a summons or filing a waiver of service in accordance with this rule or the subdivisions of Rule 4 F. R. Civ. P. made applicable by these rules is effective to establish personal jurisdiction over the person of any defendant with respect to a case under the Code or a civil proceeding arising under the Code, or arising in or related to a case under the Code.

Fed. R. Bankr. P. 7004(f). A court's exercise of personal jurisdiction over a defendant must be "consistent with the Constitution and laws of the United States." Fed. R. Bankr. P. 7004(f). "Because Fed. R. Bankr. P. 7004(f) provides for nationwide service of process, the Court need not consider any state long-arm statute. Instead, the Court looks solely to the Due Process Clause of the Fifth Amendment to the United States Constitution to determine whether the Court has personal jurisdiction over [defendant] in this adversary proceeding."

10

*Brit. Am. Ins. Co. Ltd. v. Fullerton (In re Brit. Am. Ins. Co. Ltd.),* 2013 WL 1881712, at *2 (Bankr. S.D. Fla. 2013).

When a defendant is "not present within the territory of the forum" due process requires that a court may exercise personal jurisdiction over that defendant if it has "minimum contacts with [the forum] such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *Int'l Shoe Co. v. State of Wash.,* 326 U.S. 310, 316 (1945) (internal citations and quotations omitted). The defendant's contacts must be sufficient so that it is reasonable to require the defendant to defend, in the forum, the particular litigation at issue. *See id.* at 317.

As the United States Supreme Court outlined in *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 476 (1985), the analysis is addressed in two parts. First, were the commercial actor's efforts "purposefully directed" toward the state, and, second, "[o]nce it has been decided that a defendant purposefully established minimum contacts within the forum State, these contacts may be considered in light of other factors to determine whether the assertion of personal jurisdiction would comport with 'fair play and substantial justice'", as required by *International Shoe.*

Accordingly, this Court may exercise personal jurisdiction over Mediaset if Mediaset "purposefully directed" efforts in the United States and that these "minimum contacts" with the United States are "such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *Int'l Shoe Co.,* 326 U.S. at 316; *In re Jimenez,* 627 B.R. at 545 ("In bankruptcy

proceedings where jurisdiction is based on 28 U.S.C. § 1334(b)[15], the sovereign exercising jurisdiction is the United States, not a particular state. Thus, minimum contacts *with the United States* is sufficient to satisfy the Fifth Amendment due process requirement.").

## General vs. Specific Personal Jurisdiction

There are two categories of personal jurisdiction—general and specific. General jurisdiction arises when "a foreign corporation's 'continuous corporate operations within a state [are] so substantial and of such a nature as to justify suit against it on causes of action arising from dealings entirely distinct from [a defendant's activities within the state].'" *Daimler AG v. Bauman,* 571 U.S. 117, 127 (2014) (quoting *Int'l Shoe Co.,* 326 U.S at 318). Unlike general jurisdiction, specific jurisdiction requires some connection between the activities giving rise to the contacts and the cause of action being pursued.

> *International Shoe* recognized, as well, that "the commission of some single or occasional acts of the corporate agent in a state" may sometimes be enough to subject the corporation to jurisdiction in that State's tribunals with respect to suits relating to that in-state activity. *Id.*, at 318, 66 S.Ct. 154. Adjudicatory authority of this order, in which the suit "aris[es] out of or relate[s] to the defendant's contacts with the forum," *Helicopteros Nacionales de Colombia, S.A. v. Hall,* 466 U.S. 408, 414, n. 8, 104 S.Ct. 1868, 80 L.Ed.2d 404 (1984), is today called "specific jurisdiction."

*Daimler,* 571 U.S. at 126-27.

The Liquidating Trustee argues that, based on the activities of Mediaset in the United States, Mediaset has subjected itself to the general jurisdiction of this Court, as well as this Court's specific jurisdiction. Mediaset counters that its

---

[15] This adversary proceeding, which seeks to avoid and recover a fraudulent transfer under sections 548 and 550, clearly arises under the Bankruptcy Code. *See* 28 U.S.C. §1334(b).

activities within the United States are not sufficient to subject it to the specific or general jurisdiction of this Court. Based on the facts submitted in support of the motions, the Court finds that Mediaset's activities within the United States establish sufficient minimum contacts to be subject to this Court's jurisdiction relating to anything connected with the Broadcast Businesses, that is, specific jurisdiction.

### A. Minimum Contacts

The Court will turn first to minimum contacts. *See Int'l Shoe,* 326 U.S. at 316. In determining what minimum contacts are necessary to create specific jurisdiction, the inquiry "focuses on the relationship among the defendant, the forum, and the litigation." *Walden v. Fiore,* 571 U.S. 277, 283-84 (2014) (internal citations and quotations omitted). "For a State to exercise jurisdiction consistent with due process, the defendant's suit-related conduct must create a substantial connection to the forum State. . . . First, the relationship must arise out of contacts that the 'defendant *himself*' creates with the forum State." *Id.* at 284 (quoting *Burger King,* 471 U.S. at 475). "Second, our 'minimum contacts' analysis looks to the defendant's contacts with the forum State itself, not the defendant's contacts with persons who reside there." *Id.* at 285.

The Court finds that Mediaset has purposely availed itself of the privilege of conducting activities within the United States thereby purposefully establishing minimum contacts with the United States. Mediaset acknowledges

that it does business in the United States[16]. However, these activities are not the basis upon which this Court finds minimum contacts sufficient to establish specific jurisdiction over Mediaset. It is Mediaset's deliberate choice to become involved in radio and television broadcasting in the United States through Caribevision's ownership interest in America CVSG and its affiliates that establishes the minimum contacts. In 2008 Mediaset bought shares in Pegaso, a Delaware corporation, that owned an interest in affiliated Broadcast Businesses (television and radio), operated in Florida and Puerto Rico, and it appears, perhaps in New York, through various indirect subsidiaries. Mediaset was involved in the radio and television broadcasting, not only through the two board seats on Caribevision but most significantly through the embedding of Santamaria in all aspects of the financing of the Broadcast Businesses. An example of this involvement is an email from Santamaria to the CFO of Caribevision - Jorge Salas, Carlos Vasallo and Marcell Felipe, describing negotiations for financing of the building in which the Broadcast Businesses operated, and attaching potential models for business plans.[17]

---

[16] Mediaset's sales to U.S.-based companies comprised approximately .69% of its income for 2018 – 2021. Approximately .026% of those sales were for content to be broadcasted in the U.S. While Mediaset's content is available on the "Mitele-TV a la carta" application, it is not directed specifically to the U.S.; according to Mediaset, most of its Mitele-TV content is geoblocked from U.S. users. In addition, Mediaset recently began receiving payments for Mitele's use within the U.S., comprising, according to Mediaset, an infinitesimal fraction of its business – i.e., .00006% in 2020 and .00015 in 2021. Mediaset does not otherwise currently conduct any business in the U.S. It is not registered to do business in any state and has no offices, agents, telephone listings, real estate, investments, assets or bank accounts in the U.S. Even though the business that Mediaset conducts in the United States is a small portion of its overall business, and a small portion of that business is related to internet sales, the Court finds that Mediaset's decision to conduct business in the United States is purposeful and not coincidental (the required criteria).
[17] In Mediaset's Response, Mediaset argues that Exhibit P to the Liquidating Trustee's Motion is not an email from Santamaria, but Exhibit P contains an email string, the first of which is, in fact, an email from Santamaria.

Further, Marcell Felipe testified in his deposition that "Mario Rodriguez was Mediaset's general counsel in Spain. So unlike Santamaria, he wasn't in Miami, but all the legal matters, I would generally run through Mario Rodriguez on the Telecinco side." Thus it is clear that Mediaset's interest in Pegaso was not passive.

Santamaria was directly involved in the discussions regarding what to do about the situation with Romay, the dispute over the terms of the CSA, and the failure of the FCC auction to realize the amount of funds expected. Santamaria was copied on emails from lawyers, emails that were not sent to all Caribevsion directors, discussing the lawyers' opinions with respect to the auction results and potential consequences related to the Romay State Court Litigation.[18]

Although neither Mediaset nor Pegaso were listed as defendants in the Romay State Court Litigation lawsuit, Santamaria was heavily involved in the litigation process and strategy including signing the retainer agreement for counsel retained for all the defendants including America CVSG and Caribevision. Mediaset continued to be a shareholder in Pegaso for over ten years until it sold its shares to Grupo Colte pursuant to the SPA in 2018. And until that sale, Mediaset continued to be involved in the operations of the Broadcast Businesses.

The facts of *International Shoe* are instructive. In *International Shoe* the Supreme Court held that the state of Washington could assert jurisdiction over International Shoe Co. in an action seeking payment of unpaid contributions to

---

[18] The evidence at trial illustrated more how deeply involved Santamaria was in every aspect of these discussions; but the Court did not consider evidence only introduced at trial in making its determination on personal jurisdiction.

the state unemployment compensation fund.  International Shoe argued that it had no office in the state of Washington, it did not enter into any contracts for the sale or purchase of merchandise, it did not have agents within the state and it was not incorporated in the state of Washington.  The Supreme Court rejected International Shoe's argument that the mere employment of salesmen supervised completely out of the Missouri headquarters was not a sufficient contact to satisfy the due process clause, noting that the activities carried on by International Shoe in the state of Washington "were systematic and continuous through the years in question." *Int'l Shoe,* 326 U.S. at 320. In this instance, Mediaset's contacts with the United States, with Florida, were systematic and continuous for a period of over ten years.

Mediaset points to two cases in support of its argument that neither the mere ownership of stock, nor the mere presence on a corporate board, are sufficient to establish minimum contacts.  Both cases are easily distinguishable. In *AstroPower Liquidating Trust v. Xantrex Tech., Inc. (In re AstroPower Liquidating Trust),* 2006 Bankr. LEXIS 2443 (Bankr. D. Del. 2006), the bankruptcy court held that that the plaintiff failed to demonstrate that a foreign entity's purchase of stock from a debtor corporation, which transaction, the plaintiff alleged, was constructively fraudulent, was sufficient to establish minimum contacts with the United States.  The court noted that there were no allegations, other than the purchase of the stock, to support any finding that the defendant "purposefully [availed] itself of the privilege of conducting activities with the State." *Id.* at *15-16 (internal citations omitted).  In *Shaffer v. Heitner,* 433 U.S. 186 (1977), the Supreme Court held that the mere fact that certain

individuals, both current and former officers and directors, owned stock in a publicly traded Delaware corporation (Greyhound, Inc.), was not sufficient alone to subject their stock or them to *quasi-in rem,* and thereby personal, jurisdiction, in a lawsuit filed in Delaware.   With regard to the corporate positions, the Supreme Court held that in the absence of a state statute that "treats acceptance of a directorship as consent to jurisdiction in the State", the position alone was not enough to confer personal jurisdiction. *Id.* at 215-16.   In this case, Santamaria was not only a board member; he was, on behalf of Mediaset, actively involved in the Broadcast Businesses.

Based on the evidence submitted in support of the Liquidating Trustee's Motion, the Court finds that Mediaset purposefully established minimum contacts in the U.S. with respect to anything relating to the Broadcast Businesses.

### B. Notions of Fair Play and Substantial Justice

Having determined that Mediaset purposefully established minimum contacts with the United States, the Court must now determine whether the assertion of personal jurisdiction would comport with "fair play and substantial justice." "[T]he foreseeability that is critical to due process analysis ... is that the defendant's conduct and connection with the forum State are such that he should reasonably anticipate being haled into court there." *Burger King,* 471 U.S. at 474 (quoting *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 295 (1980)). The activity necessary to satisfy the requirement that the defendant "reasonably anticipate being haled into court" "will vary with the quality and nature of the defendant's activity", should not be "random" "fortuitous" or

attenuated", but "jurisdiction is proper, however, where the contacts proximately result from actions by the defendant *himself* that create a 'substantial connection' with the forum State." *Burger King,* 471 U.S. at 474-75. "Thus where the defendant 'deliberately' has engaged in significant activities within a State … he manifestly has availed himself of the privilege of conducting business there" *Id.* at 475-76 (citations omitted). Moreover, "[j]urisdiction in these circumstances may not be avoided merely because the defendant did not *physically* enter the forum State." *Id.*

The evidence on summary judgment clearly illustrates that Mediaset had every expectation that litigation arising out of the Broadcast Businesses would take place in the United States – in fact, in Miami, Florida. The First Romay Litigation was filed in circuit court in Miami, Florida. Mediaset entered into two agreements relating directly to the Broadcast Businesses – the SPA and the CSA - in which Mediaset agreed that each agreement would be governed by the laws of Florida and venue of any dispute would be in the circuit court in Florida. And, in fact, when Grupo Colte failed to make the second installment under the SPA Mediaset filed a lawsuit against Grupo Colte in Miami-Dade County Circuit Court. Thus, Mediaset had a clear expectation that litigation relating to the Broadcasting Businesses, and Mediaset's divesting of its interest in the Broadcast Businesses, would be litigated in the United States and could not be surprised that any litigation relating to its interest in Pegaso and Caribevision

would end up being litigated in Florida, the situs of the injury and the situs of the business.[19]

In *Nordberg v. Granfinanciera, S.A.* (*In re Chase & Sanborn Corp.),* 835 F.2d 1341 (11th Cir. 1988), the Eleventh Circuit considered whether a bankruptcy court had properly exercised jurisdiction over Colombian defendants in a fraudulent transfer action. The Eleventh Circuit outlined the elements that a court must consider when confronted with the issue of whether the exercise of jurisdiction "comports with fair play and substantial justice":

> (a) the extent of the defendant's purposeful interjection into the forum state; (b) the burden on the defendant of defending in the forum; (c) the extent of conflict with the sovereignty of defendant's state; (d) the forum state's interest in adjudicating the dispute; (e) the most efficient judicial resolution of the controversy; (f) the importance of the forum to plaintiff's interest in convenient and effective relief; and (g) the existence of an alternative forum.

*Id.* at 1345.[20]

Application of these factors further confirms this Court's exercise of personal jurisdiction over Mediaset. The Court already addressed the first factor,

---

[19] The venue clauses do not in and of themselves establish minimum contacts or jurisdiction. *Burger King,* 471 U.S. at 482. *See, e.g., Storm v. Carnival Corp.,* 2020 WL 7415835 (S.D. Fla. 2020) (A venue provision in a contract between a cruise line and a foreign excursion operator was not enough to exercise jurisdiction over the excursion operator in a personal injury action filed by a non-signatory plaintiff, who could not demonstrate plaintiff was a third party beneficiary to the agreement); *Johnson v. Royal Caribbean Cruises, Ltd.,* 474 F. Supp.3d 1260 (S.D. Fla. 2020) (same). However, venue selection clauses, especially with respect to litigation directly associated with the interests related to the suit in action, can be considered in determining whether Mediaset could reasonably be expected to be "haled" into court in the United States with respect to any litigation relating to the Broadcast Businesses. *See Burger King,* 471 U.S. at 482 ("Although such a provision standing alone would be insufficient to confer jurisdiction" when combined with other "minimum contacts" "it reinforced [the defendant's] deliberate affiliation with the forum State and the reasonable foreseeability of possible litigation there.").

[20] The mere fact that Mediaset, knowingly or otherwise, received money from America CVSG's bank account in the United States is not, as the Liquidating Trustee suggests, sufficient to create any kind of jurisdiction over Mediaset.

the extent of Mediaset's purposeful interjection into the United States. The second factor, the burden on the defendant of defending in the forum, weighs against Mediaset because Mediaset has the means and the money to litigate in the United States, as illustrated by the fact that Mediaset did file the Mediaset State Court Litigation against Grupo Colte in Florida. Mediaset has not suggested that the fraudulent transfer case, or the assertion of jurisdiction over Mediaset somehow conflicts with Spain's sovereignty.   The balance of the factors are addressed by the fact that this action has been brought pursuant to a confirmed bankruptcy plan.   The bankruptcy court's jurisdiction has been specifically reserved to adjudicate this action. Moreover, the Liquidating Trustee would not be able to pursue this cause of action in Spain.

## **CONCLUSION**

For the reasons set forth above, the Court has specific personal jurisdiction over Mediaset.

Accordingly, it is **ORDERED**:

1.    Mediaset's Motion is DENIED.

2.    The Liquidating Trustee's Motion is GRANTED IN PART.

### ###

Copies to:
Patricia A. Redmond, Esq.
Monique D. Hayes, Esq.

*Attorney Hayes is directed to serve a copy of this Order on interested parties who do not receive service by CM/ECF, and file a proof of such service within two (2) business days from entry of the Order.*