*Tagged opinion*



**ORDERED in the Southern District of Florida on September 18, 2024.**

**Laurel M. Isicoff, Judge**
**United States Bankruptcy Court**

---

# UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF FLORIDA
## MIAMI DIVISION
### www.flsb.uscourts.gov

| | |
|---|---|
| In re: | CHAPTER 11 |
| AMERICA-CV STATION GROUP INC., | Case No. 19-16355-BKC-LMI |
| Debtor | |
| _____/ | |
| OMAR ROMAY, Liquidating Trustee, for the Liquidating Trust of America-CV Station Group Inc., | Adv. Pro. Case No. 21-01059-LMI |
| Plaintiff, | |
| v. | |
| MEDIASET ESPAÑA COMMUNICACION S.A., | |
| Defendant. | |
| _____/ | |

## <u>MEMORANDUM OPINION ON FINAL JUDGMENT</u>

THIS MATTER came before the Court for trial upon the *Complaint to Avoid*

*Transfer and to Recover Property* (ECF #1) (the "Adversary Complaint") filed by Plaintiff, Omar Romay, as Liquidating Trustee for the Liquidating Trust of Debtor America-CV Station Group, Inc. ("Plaintiff" or "Liquidating Trustee") against Mediaset España Comunicación, S.A., now known as Grupo Audiovisual Mediaset España Comunicación, S.A.U. ("Mediaset" or the "Defendant"). The Court held a six-day trial on the Adversary Complaint on March 12, 13, 15, 18, 19, and 20 of 2024 (the "Trial"). For the reasons set forth herein, the Court will grant judgment in favor of the Defendant Mediaset.

## **JURISDICTION AND PROCEDURAL HISTORY**

The Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §1334(b). This is a core proceeding for which the Court is authorized to determine all matters in accordance with 28 U.S.C. §157(b)(2)(H). The parties agree the Court has authority. Venue is proper in this district pursuant to 28 U.S.C. §1409. The statutory authorities which govern the relief requested by the Plaintiff in the Adversary Complaint are 11 U.S.C. §§548(a) and 550.

On May 14, 2019 (the "Petition Date"), America-CV Station Group, Inc. ("America CVSG" or "Debtor") filed a voluntary petition in the United States Bankruptcy Court for the Southern District of Florida (the "Bankruptcy Court") for relief under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") under Case No. 19-16355-BKC-AJC (the "Main Case"). Three other companies affiliated with the Debtor also filed for bankruptcy: Caribevision Holdings, Inc. ("Caribevision")[1] under Case No. 19-16359-BKC-AJC, America-CV

---

[1] At some point after March 9, 2017, Caribevision changed its name to America Teve Holdings, Inc. The Court will refer to Caribevision as Caribevision even if the period to which the Court is

Network, LLC ("America-CV Network") under Case No. 19-16976-BKC-AJC, and Caribevision TV Network, LLC ("Caribevision Network") under Case No. 19-16977-BKC-AJC (Caribevision, America-CV Network, and Caribevision Network are collectively, the "Affiliated Debtors").

Before the bankruptcy cases were filed, the Romay Parties[2] on the one hand and America CVSG and the Affiliated Debtors on the other were involved in extensive litigation including the First Romay State Court Litigation (defined hereinafter) and the Second Romay State Court Litigation (defined hereinafter). Based upon the Second Romay State Court Litigation, the Romay Parties filed joint and several claims in the amount of $12,919,740.88 against each of America CVSG and the Affiliated Debtors (the "Romay Claim")[3] in each of the bankruptcy cases. During the chapter 11 cases the Debtor, the Affiliated Debtors, and the Romay Parties settled the Second Romay State Court Litigation and that settlement (the "Romay Settlement") became a part of the Debtor's chapter 11 plan (Main Case ECF #125 )[4] (the "Plan"). The Plan provided that the Romay Claim would be satisfied, in part, by assignment to a Liquidating Trust of a fraudulent conveyance action to recover payment of a $10 million pre-petition payment to Mediaset (the "Transfer"). The Romay Parties also received a

---

referring Caribevision's corporate name was America Teve, and some documents refer to America Teve.

[2] The "Romay Parties," as defined in the Plan (defined hereinafter), are Omar Alejandro Saul Romay, Okeechobee Television Corp., Promisa, Inc., Sherjan Broadcasting, Inc., Telecenter, Inc., and America Teve Network, Inc.

[3] The "Romay Claim," as defined in the Plan (defined hereinafter) is: "the following joint and several claim filed by the Romay Parties in the amount of $12,919,740.88: (i) Claim No. 3-1 in the Caribevision Holdings Case, (ii) Claim Nos. 9-1 and 11-1 filed in this Chapter 11 Case, (iii) Claim No. 20-1 filed in the America-CV Network Case, and (iv) Claim No. 1-1 in the Caribevision Case" ("Proofs of Claim").

[4] The Court cites entries on the Main Case docket as "Main Case ECF #".

lump sum cash distribution of $1.5 million pursuant to the Plan.

On February 24, 2021, the Plaintiff filed this adversary proceeding. Various issues were resolved by pre-trial and mid-trial motions. The remaining issues are the subject of this ruling.[5]

### FINDINGS OF FACT AND CONCLUSIONS OF LAW[6]

Mediaset[7] is a Spanish company with its principal place of business in Madrid, Spain, where it conducts the vast majority of its business, focusing for the most part on television broadcasting. Mediaset operates primarily outside the United States. In 2008, Mediaset purchased a minority interest in Pegaso Television, Inc. ("Pegaso"), a Delaware corporation. Pegaso owned a minority interest in Caribevision, also a Delaware corporation. Caribevision in turn owned stock in America CVSG which collectively operated television and radio stations

---

[5] After this Court denied Mediaset's motion to dismiss, Mediaset filed its answer and affirmative defenses on March 22, 2022 (later amended on November 4, 2022). The Court granted in part Mediaset's motion for summary judgment regarding WJAN ownership, holding that WJAN was an asset of America CVSG as of April 23, 2018, and denied in part that motion as to adequate capitalization. *Defendant, Mediaset's Motion for Partial Summary Judgment as to WJAN Ownership and Adequate Capitalization* (ECF #173); *Order Granting In Part and Denying In Part Defendant Mediaset's Motion for Partial Summary Judgment as to WJAN Ownership and Adequate Capitalization* (ECF #328). The Court granted in part Plaintiff's motion for summary judgment on the issue of personal jurisdiction and denied all other motions for summary judgment. *Order Denying Defendant, Mediaset España Comunicación, S.A's Motion for Partial Summary Judgment on Standing* (ECF #337); *Order on Motions for Summary Judgment Relating to Personal Jurisdiction* (ECF #342). The Court denied Mediaset's motion for judgment on partial findings and granted Plaintiff's motion for judgment on partial findings under Fed. R. Civ. P. 52(c) as to Mediaset's first affirmative defense under 11 U.S.C. §548(c); Mediaset's remaining second affirmative defense was withdrawn. *Order Denying Mediaset's Ore Tenus Motion for Judgment on Partial Findings* (ECF #335); *Order Granting Plaintiff's Motion for Partial Findings Under Rule 52C* (ECF #340).

[6] The findings of fact and conclusions of law set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Rule 7052 of the Federal Rules of Bankruptcy Procedure ("Fed. R. Bankr. P."). To the extent any of the following findings of fact are determined to be conclusions of law, they are adopted, and shall be construed and deemed, as conclusions of law. To the extent any of the following conclusions of law are determined to be findings of fact, they are adopted and shall be construed and deemed, as findings of fact. Some of these facts are not contested and were set forth in the *Joint Pretrial Stipulation* (ECF #199) submitted before the Trial.

[7] Mediaset was formerly known as Gestavision Telecinco, S.A.

in the United States, including Puerto Rico (collectively the "Broadcast Businesses"). Caribevision itself did not have operations.  At some point the operations of the Broadcast Businesses were transferred to another affiliate – America-CV Network.  However, America CVSG continued to own the licenses to operate the Broadcast Businesses, the use for which America-CV Network paid a monthly fee to America CVSG.

When Mediaset purchased the stock in Pegaso, two Mediaset employees were appointed to Caribevision's six-member board, Angel Santamaria Barrio ("Santamaria") and Ana Cristina Castilla ("Castilla").[8] In addition, Mediaset designated Santamaria to serve as an employee of Caribevision; in that capacity Santamaria worked in "treasury and all the financial matters" and, according to Marcell Felipe, in-house counsel for the Debtor and Affiliated Debtors, at some point Santamaria served as CFO (of which entity or all, or when, is not clear).[9]

At some point after Mediaset purchased its interest in Pegaso, Caribevision and the Romay Parties entered into a joint venture arrangement pursuant to which Caribevision owned 50% of America CVSG and Omar Romay, in his individual capacity, together with some of the other Romay Parties owned the other 50%. Romay was operating the Broadcast Businesses pursuant to the joint venture agreement.

---

[8] During the relevant time period, Carlos Vasallo or his entities appointed two members to the Caribevision board: Mr. Vasallo and Marcell Felipe (Mr. Vasallo's attorney and eventual corporate counsel for America CVSG). Pegaso appointed four representatives: two representatives associated with Alejandro Burillo- Emilio Braun (Mr. Burillo's nephew, who also had an equity interest in Pegaso through Grupo Brabur)  and Fernando Elias Calles (attorney for Mr. Burillo and Pegaso and director of Pegaso); and two representatives of Mediaset- Castilla and Santamaria.

[9] Mediaset disputes that Santamaria had any real involvement in the Broadcast Businesses after the joint venture agreement with Romay. *See Mediaset's Motion for Reconsideration of Order on Motions for Summary Judgment Relating to Personal Jurisdiction* (ECF #353).

In 2011, Caribevision, along with other entities holding direct or indirect interests in the Broadcast Businesses (including Mediaset), sued the Romay Parties and others (the "First Romay State Court Litigation") alleging that Romay had breached his fiduciary duties to Caribevision and that the Romay Parties had breached the joint venture agreement. In November 2015, a $58 million verdict was entered in favor of Caribevision, Mediaset, and others against the Romay Parties and other defendants (the "Romay Judgment"). Around this time the FCC scheduled what is called a reverse auction for broadcast licenses.[10]

On December 7, 2015, the parties to the First Romay State Court Litigation agreed to split up their businesses pursuant to a settlement in which America CVSG (the entity that owned the broadcast licenses used in the Broadcast Businesses) would sell those licenses through an FCC "reverse auction", and the proceeds would be divided in a waterfall designed to pay the Romay Judgment to the successful plaintiffs and give some proceeds to the Romay Parties. The settlement was premised on the expectation that the sale of the TV licenses in the FCC reverse auction (the "FCC Auction") would yield more than $200 million in proceeds, so that, even after accounting for the $58 million Romay Judgment, there would still be substantial profits to be split between Caribevision and the Romay Parties. The First Romay State Court Litigation settlement was reflected in a Confidential Settlement Agreement (the "CSA" or "December 2015 Agreement"). Under the CSA, the entities responsible for making decisions about management of the Auction as well as of America CVSG, and America-CV

---

[10] The Court will address the FCC Auction in more detail in the discussion of the expert testimony regarding valuation of the broadcast licenses.

Network, as well as distribution of any auction proceeds were Caribevision, Caribevision Network, and Caribevision Station Group, LLC. The agreements reflected in the CSA were never realized because the proceeds of the Auction, approximately $13 million (the "Auction Proceeds"), were a fraction of what was anticipated.

Disputes arose almost immediately about Romay's entitlement to any of the Auction Proceeds. After the Auction results were finalized in April of 2017, Romay demanded between $8-9 million. Members of the Caribevision board of directors, including counsel, held extensive internal discussions regarding the FCC Auction results, the Auction Proceeds, and whether Romay should receive any of it. Ultimately, Caribevision decided that based on its interpretation of the CSA, as well as its advice from counsel, it would not distribute any Auction Proceeds to Romay.

On December 12, 2017, the Romay Parties initiated a lawsuit against America CVSG, Caribevision, Caribevision Network, and Caribevision Station Group, LLC (collectively the "Caribevision Defendants"), and Spanish Broadcasting Systems, Holdings Group, Inc. seeking to recover what the Romay Parties claimed was their share of the Auction Proceeds and other damages (the "Second Romay State Court Litigation") for a total claim of $21,000,000.00.

Even before the Second Romay State Court Litigation was filed, Mediaset had decided it wanted out of the Broadcast Businesses. After extensive negotiations, on March 23, 2018, Mediaset and Grupo Colte, S.A. de C.V. ("Grupo Colte"), the largest shareholder of Pegaso, entered into a Share Purchase Agreement whereby Grupo Colte agreed to purchase Mediaset's shares in Pegaso

(the "SPA"). Pursuant to the SPA, Grupo Colte purchased from Mediaset 21,594,787 shares of stock (the "Shares") in Pegaso.

Pursuant to the SPA, the purchase price for the Shares was $12,500,000.00, payable by Grupo Colte in three installments. The first installment in the amount of $10,000,000.00 was due to Mediaset on April 23, 2018. The second installment, in the amount of $1,250,000.00 was due on March 31, 2019. The third installment, also in the amount of $1,250,000.00, was conditioned on the outcome of the Second Romay State Court Litigation. On April 23, 2018 (the "Transfer Date"), America CVSG sent a wire of $10,000,000.00 from its Iberia Bank account to Mediaset (the "Transfer"). According to Mediaset, it did not realize the funds were not sent by Grupo Colte until after Mediaset became aware of the alleged fraudulent transfer claim.

The Adversary Complaint has three counts – Count I seeks relief under 11 U.S.C. §548(a)(1)(B) – constructive fraud; Count II seeks relief under 11 U.S.C. §548(a)(1)(A) – actual fraud; Count III seeks relief under 11 U.S.C. §550 – recovery of the funds transferred.  The Plaintiff bears "the burden of proving all elements of a fraudulent transfer claim by a preponderance of the evidence." *General Electric Credit Corporation of Tennessee v. Murphy (In re Rodriguez),* 895 F.2d 725, 726 n.1 (11th Cir. 1990); *In re Gomez,* 560 B.R. 866, 872 (Bankr. S.D. Fla. 2016).[11]

## Constructive Fraud

To prevail on a claim for recovery of a constructively fraudulent transfer,

---

[11] Certain elements of both Counts I and II are not disputed – (a) the $10,000,000 that is the subject of the Transfer was property of the Debtor on the date of the Transfer, and (b) the Transfer was made within two years of the Petition Date.

the Plaintiff must prove that the Debtor "received less than a reasonably equivalent value in exchange for such transfer or obligation"; and

(I)     [The Debtor] was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation; [or]

(II)    [The Debtor] was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital; [or]

(III)   [The Debtor] intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured[.]

11 U.S.C. §548(a)(1)(B)(i), (B)(ii)(I)-(III).

## A. America CVSG did not receive reasonably equivalent value for the Transfer.

Reasonably equivalent value, although not defined in the Bankruptcy Code, focuses on what a debtor has received in exchange for the transfer. *See Menchise v. Clark* (*In re Dealers Agency Services, Inc.*), 380 B.R. 608, 619-20 (Bankr. M.D. Fla. 2007) (internal citations omitted). The Eleventh Circuit has recognized that the "concept of 'reasonably equivalent value' does not demand a precise dollar-for-dollar exchange." *Advanced Telecomm. Network, Inc. v. Allen (In re Advanced Telecomm. Network, Inc.),* 490 F.3d 1325, 1336 (11th Cir. 2007). Still, value must be quantifiable and objectively comparable to the amount the debtor gave up. *See Menotte v. Leonard (In re Leonard),* 418 B.R. 477, 486 (Bankr. S.D. Fla. 2009) (holding that debtor did not receive reasonably equivalent value under section 548(a)(1)(B) when the debtor gave value of $56,000 and received value of $18,250).

Mediaset argues that America CVSG received reasonably equivalent value in exchange for the Transfer by virtue of a book entry in the general ledger of

America CVSG describing the Transfer to Mediaset as a loan to Pegaso.[12] However, that is all there was – a book entry, and only on the books of America CVSG. There was no promissory note evidencing an obligation from Pegaso to America CVSG. None of Pegaso's books or records, or tax returns, ever listed an obligation from Pegaso to America CVSG. There was a $10,000,000.00 promissory note signed near the time of the Transfer, with Pegaso as the borrower and America Teve Holdings, Inc. as the lender. That promissory note does reference the purchase of the Mediaset Shares. However, Pegaso was not the purchaser of the Mediaset Shares – Grupo Colte was. And America Teve Holdings, Inc. did not provide the funds for the Transfer; that was America CVSG. There is no dispute that there was no written agreement between Pegaso and America CVSG with respect to the $10,000,000.00 journal entry. And Mediaset has not established by a preponderance of the evidence that there was any unwritten agreement between Pegaso and America CVSG with respect to the $10,000,000.00 journal entry. *See St. Joe Corp. v. McIver,* 875 So.2d 375, 381 (Fla. 2004) ("An oral contract . . . is subject to the basic requirements of contract law such as offer, acceptance, consideration and sufficient specification of essential terms. . . . A party who asserts an oral contract must prove its existence

---

[12] The Court previously granted, in part, Plaintiff's Motion for Judgment on Partial Findings, with respect to the issue of whether Mediaset provided value to America CVSG in exchange for the Transfer. While that ruling was made in connection with Mediaset's first affirmative defense asserted under 11 U.S.C. §548(c), the same reasoning applies to the Court's finding that America CVSG did not receive reasonably equivalent value under 11 U.S.C. §548(a)(B)(i). *See Keith Eickert Power Products, LLC v. Escada (In re Keith Eickert Power Products, LLC),* 344 B.R. 685, 690 n.1 (Bankr. M.D. Fla. 2006) (finding no reasonable value was provided in exchange for transfer and that the same reasoning also precluded transferee from asserting the protections afforded by section 548(c): "[w]hether reasonable value or simplistically 'value', the Company received nothing in exchange for its funds.").

by a preponderance of the evidence.") (internal citations omitted).

Under Florida law, a credit agreement must be in writing, express consideration, set forth the relevant terms and conditions, and be signed by both the creditor and the debtor in order to be enforceable. *See* Fla. Stat. §687.0304(2); *Wells Fargo Bank, N.A. v. Richards,* 226 So. 3d 920 (Fla. 4th DCA 2017); *Eboni Beauty Academy v. AmSouth Bank of Florida,* 761 So. 2d 481 (Fla. 5th DCA 2000). Section 687.0304 of the Florida Statutes defines credit agreements to mean "an agreement to lend or forbear repayment of money, goods, or things in action, to otherwise extend credit, or to make any other financial accommodation." Fla. Stat. §687.0304(1)(a). Mediaset argues that there are circumstances in which, under a variety of theories, Florida law will enforce a loan obligation notwithstanding the absence of a written agreement. However, in each of the cases on which Mediaset relies, there are specific facts that are not present here. Mediaset also suggests, in closing submissions, that the appropriate way in which to address the lack of written documentation is to discount the value of the "receivable" to $3 million; however, there was no evidence presented at Trial, by way of expert testimony or otherwise, that would support this argument.

Based on the testimony of the witnesses at Trial regarding this transaction, primarily Jorge Salas, the CFO of America CVSG, and Marcel Felipe, corporate counsel for the Broadcast Businesses as well as to Carlos Vasallo, the Court finds that at the time the Transfer was made, there was no clear idea how to describe the Transfer and no intent, even by America CVSG, to make a loan to any entity (making loans was not something America CVSG "did"). The loan

"idea" was described by Mr. Felipe in his testimony as a "placeholder" "until it got sorted out." Ultimately, when the books and records of America CVSG were audited, and at the direction of the auditors, the so-called loan was recharacterized as a distribution. When questioned about whether the "loan" was expected to be paid, twice, Mr. Salas testified: "[n]obody told me they would not be paid, but nobody told me it will be collected."

There was no evidence presented at the Trial that Pegaso ever agreed to be indebted to America CVSG for the $10,000,000.00 journal entry. As the court wrote in *Nat'l Bank of Paulding v. Fid. & Cas. Co.*, 131 F. Supp. 121, 123–24 (S.D. Ohio 1954): "[i]n order to have a loan, there must be an agreement, either expressed or implied, whereby one person advances money to the other and the other agrees to repay it upon such terms as to time and rate of interest, or without interest, as the parties may agree. In order to have a contract, there must be a meeting of minds." But there was no "meeting of the minds"; Pegaso never received $10,000,000.00 from America CVSG or from Caribevision. Mediaset's expert, Mr. Feltman, testified that he never saw a document where Pegaso obligated itself to pay America CVSG $10,000,000.00. There was no evidence that either Pegaso or America CVSG benefitted from the purchase of Mediaset's shares by Grupo Colte. The accountant for the Broadcast Businesses and Pegaso, Jose Iglesias, testified that there was no loan listed on the Pegaso tax return under liabilities for the relevant time period.

Based on the evidence, and absence thereof, the Court finds that at the time of the Transfer, there was no loan or any intent to create a loan; the journal entry had no legally cognizable value. The Court therefore holds that America

CVSG did not receive reasonably equivalent value or, in fact, any value, in exchange for the Transfer.

### B.    America CVSG was not insolvent at the time of the Transfer.

The Adversary Complaint alleges that the Transfer caused America CVSG to become insolvent, left America CVSG with inadequate capital, and caused America CVSG to be unable to pay its debts as they came due.

The Bankruptcy Code defines "insolvent" as—

> (A) with reference to an entity other a partnership and a municipality, financial condition such that the sum such entity's debts is greater than all of such entity's property, at a fair valuation, exclusive of—
>
> (i)    property transferred, concealed, or removed with intent to hinder, delay, or defraud such entity's creditors; and
>
> (ii)   property that may be exempted from property of the estate under section 522 of this title;

11 U.S.C. §101(32)(A). The issue then is whether the fair value of a debtor's debts exceeds the fair value of the debtor's assets. *See Schwartz v. Halwani (In re 274 Atl. Isles, LLC)*, 651 B.R. 319, 331 (Bankr. S.D. Fla. 2023). This is also referred to as the "balance sheet test" of insolvency. *Id.*

With respect to the insolvency analysis in this case, the value of two assets, or asset groups, are at issue, while the calculation of one debt is at issue. The two asset values at issue are first, the value of the $10,000,000.00 "loan" to Pegaso; and second, the value of the broadcast licenses that America CVSG continued to own at the time of the Transfer. The debt at issue is the value of the

then contingent liability owed to the Romay Parties in connection with the Second Romay State Court Litigation.

The Court has already addressed the value to American CVSG of the $10,000,000.00 Pegaso "loan". That value is zero.

### 1.   <u>Valuation of the Broadcast Licenses</u>

The other asset valuation at issue is the value of the broadcast licenses at the time of the Transfer. At the time of the Transfer, and after the Auction, America CVSG continued to own at least five broadcast licenses, however for purposes of the insolvency analysis the parties focused on the value of three broadcast licenses – two in Puerto Rico, WJPX and WJWN[13], and one in Miami – WJAN[14].

Four experts testified as to the value of the television broadcast licenses – Mr. Kapila, Mr. Feltman, Dr. Harold Furchtgott-Roth, and in rebuttal to Dr. Furchtgott-Roth, Ms. Lauren Ross. Mr. Feltman's testimony regarding solvency, which incorporated the value of the licenses, was based on Dr. Furchtgott-Roth's testimony. Mr. Kapila, who does not have any expertise in valuing FCC licenses or broadcast stations, based his testimony almost entirely on the appraisal obtained by the Debtor in the Second Romay State Court Litigation, as well as a valuation of zero or unknown value of the stations in various bankruptcy filings.

For purposes of making its decision on the value of the broadcast licenses,

---

[13] One of the issues in dispute in the Second Romay State Court Litigation was the decision to pull two of the four stations in Puerto Rico from the Auction. That issue does not relate to the value of the remaining stations.

[14] The Plaintiff claimed that WJAN was actually owned by Caribevision at the time of the Transfer. However, the Court ruled in its *Order Granting In Part and Denying In Part Defendant Mediaset's Motion for Partial Summary Judgment as to WJAN Ownership and Adequate Capitalization* (ECF #328) that the ownership of WJAN was not transferred to Caribevision, and that, at the time of the Transfer, WJAN was owned by America CVSG.

the Court will focus primarily on the testimony of Dr. Furchtgott-Roth and of Ms. Ross, both of whom the Court ruled are experts qualified to provide expert testimony on the value of the broadcast licenses. Each of them has a very different methodology on how to value the licenses. The Court found issues with the methodology of both experts. However, rather than disregard all testimony, the Court, as more fully detailed below, has chosen to reach valuation based on Ms. Ross' valuation as modified by Dr. Furchtgott-Roth's methodology.

Dr. Furchtgott-Roth has an impressive history with broadcast licenses, even serving, at one point in his career, as a Commissioner of the Federal Communications Commission (the "FCC"). Prior to that Dr. Furchtgott-Roth was a significant contributor to the drafting of the Telecommunications Act of 1996. Dr. Furchtgott-Roth has, over a period of more than twenty years, advised at least a dozen companies on the value of FCC licenses.

Ms. Ross is the Vice President of Media Valuations at BIA Advisory Services, LLC and has been with that company for more than 35 years. Her specialty, as an Accredited Senior Appraiser in Business Valuation, is in appraising broadcasting and media properties. Ms. Ross testified that she had "been retained to perform valuations of thousands of broadcasting properties and companies."

Dr. Furchtgott-Roth testified that FCC licenses are, with one exception, always valued in connection with the broadcast station to which the license is attached. The only exception is the reverse auction conducted from time to time by the FCC. However, according to Dr. Furchtgott-Roth, in reaching his valuation of the FCC licenses, he did not alter his valuation to reflect any hard assets of a broadcast station associated with the purchase of any FCC license,

notwithstanding that he acknowledged that America CVSG only held the broadcast licenses, not the hard assets. Dr. Furchtgott-Roth's testimony regarding the value of WJAN was based on the price paid at the FCC Auction for what he testified was a comparable station[15], as well as a sale that took place four years after the Transfer Date. Dr. Furchtgott-Roth's valuation of the two Puerto Rico stations was based, first, on sales of comparable stations (or their spectrum) at the FCC Auction, and then on "price per population" figures and values that he took from the Hoffman Schutz Media Capital appraisal that had been commissioned by Romay in the Second Romay State Court Litigation, as well as an appraisal prepared in the same litigation by a company called SNL Kagan Consulting. Dr. Furchtgott-Roth testified that he valued the two Puerto Rico stations separately, although he recognized the stations were subject to a channel sharing agreement and, he accordingly, discounted the value included in the Hoffman Schutz appraisal of one of the stations by 50%. Dr. Furchtgott-Roth testified that the two appraisals used the comparable sales approach, which, he testified, "is the standard method of valuing FCC licenses." However, Dr. Furchtgott-Roth centered his valuation on a sale of the licenses untethered from any broadcast station, which, he testified, can only occur in connection with an FCC reverse auction. After applying his methodology, Dr. Furchtgott-Roth testified that as of the Transfer Date the estimated value of the WJAN license was in a range of $3.15 to $3.994 million, and, based almost entirely on the two prior appraisals, that the estimated value of the two Puerto Rico stations was in the

---

[15] Dr. Furchtgott-Roth testified he did not know for sure whether the population served for this comparable was similar to that of WJAN, just that the broadcast areas seemed similar based on FCC coverage charts.

range of $5.627 million to $6.305 million.

While Ms. Ross used the comparable sales approach as well, she used a completely different methodology in challenging Dr. Furchtgott-Roth's valuations. Using the comparable sales approach, Ms. Ross testified, she valued the station with the license using the "price per population" or "price per pop" using comparable transactions to the extent available, and then using that formula, and the population figures for the service area for the stations using the Debtor's licenses, came to a valuation, from which, then, Ms. Ross deducted costs of "building" the station (not including land and building, which she assumed would be leased) as if the station were being built brand new. In determining comparable sales, Ms. Ross did not use any transactions that took place after the Transfer Date. For her valuation of WJAN, Ms. Ross' comparable transactions were from 2014 and 2015, discounted for decreases in value of FCC licenses after the FCC Auction.[16] Based on Ms. Ross' application of her methodology, she testified the value of the WJAN station as of the Transfer Date was $2,063,000.00, reduced by $512,000.00 in estimated costs associated with buying everything necessary to start a new station (other than land and building).

For her valuation of the Puerto Rico stations, Ms. Ross testified that the stations had to be valued together because that was the only way service could be "full island," disagreeing with Dr. Furchtgott-Roth's testimony that the stations could each be sold as stand alone. Ms. Ross testified that as of the Transfer Date,

---

[16] Ms. Ross testified that she believes the great disparity in the pre-Auction and post-Auction sales were attributable to buyers buying the stations in anticipation of the FCC Auction, which historically generated significant profits, and a "rightsizing of value" after the FCC Auction when the only avenue for sale were non-FCC buyers.

the value of the two Puerto Rico stations, using what comparables (off-island) were available, was $4,314,000.00, reduced by start-up and equipment costs of $2,422,000.00.

Ms. Ross testified that she did not believe the values in the FCC Auction were reflective of fair market value since the FCC reverse spectrum auctions are unique, and only happen infrequently. Indeed, the FCC Auction that is the subject of the Second Romay State Court Litigation had been in the planning stages for 20 years, and there is no indication when the next auction will occur.

There were problems with both methodologies.  While Dr. Furchtgott-Roth clearly has an impressive history with the FCC and the broadcast industry in general, his experience in advising companies regarding the purchase and value of FCC licenses and broadcast stations is very limited, as compared to Ms. Ross' extensive experience in this precise area. Moreover, the Court agrees with Ms. Ross that in valuing the licenses, less weight should be given to the prices paid in the FCC Auction, since those auctions are few and far between.  A better reflection of value should focus on the many instances that broadcast stations are bought and sold in the market, as opposed to a single FCC auction.[17]  Finally, the Court finds that it is not appropriate to disregard completely the value of hard assets, especially, where, as here, the stations and the licenses are owned by different entities, a fact which Dr. Furchtgott-Roth appeared to be unaware.

While the Court finds that Ms. Ross' methodology for valuing the licenses was more reliable, insofar as the comparables she used, the calculation of value

---

[17] Ms. Ross also pointed out that, in addition to the market for broadcast stations and licenses, these companies have their finances audited annually, and the auditors are required to calculate the value of intangible versus tangible assets.

using price per pop, and assumptions regarding the value of the two Puerto Rico stations together, the Court is not comfortable with the reductions that Ms. Ross applied.  The Court accepts Ms. Ross' testimony that, to value a license, there must be some adjustment for the value of tangible assets associated with the license. The Court notes that Ms. Ross failed to explain how she came up with the construction cost reductions, and those calculations were barely challenged on cross-examination.  Moreover, there was no testimony to counter Ms. Ross' calculation of start-up costs.  However Ms. Ross never explained why it would be appropriate to use "new station" valuations, when she acknowledged that all three stations had been around and operating for quite some time.  The Court cannot accept, without some explanation, which was not provided, that it is appropriate to reduce the value of the stations by a hypothetical value that has no relationship to the reality of the licenses being valued – the opposite problem with Dr. Furchtgott-Roth's valuation, that ignored hard assets completely.

The Court has two choices.  One is to completely disregard both experts and assume the licenses have no value (or require another expert), or the Court can adjust Ms. Ross' testimony using only objective simple adjustments.  The Court finds it appropriate to use Ms. Ross' valuation without reducing the value of the stations by the construction costs, which is the approach Dr. Furchtgott-Roth advocated for in any case.  Based on this adjustment, the Court finds as of the Transfer Date the value of WJAN was $2,063,000.00 and the value of the Puerto Rico stations was $4,314,000.00.

## 2.   Valuation of the Contingent Liability

The last issue of contention related to balance sheet insolvency is how the

contingent liability of the Second Romay State Court Litigation (the "Romay Contingency") should have been valued. While both sides agree that the Romay Contingency was, in fact, a contingent liability at the time of the Transfer, the two experts had widely different views on its value at that time. The expert for the Plaintiff, Mr. Kapila, testified that the Romay Contingency should be valued at $9,320,609.00, which is the highest range of the amount set forth in an April 2019 non-final order entered by the state court a year after the Transfer. The expert for Mediaset, Mr. Feltman, testified that the Romay Contingency should be valued at a range between $3.15 million and $4.05 million.

The Eleventh Circuit has set out a framework pursuant to which a contingent liability is to be valued in determining a debtor's insolvency. *Advanced Telecomm.,* 490 F.3d at 1335. The Court is required to estimate "the expected value of a judgment against [the debtor]" and then multiply "that value by the chance that [the debtor] would face such a judgment . . . ." *Id.* That is, the Court must "calculate the present value of the liability – the expected cost of the liability times the estimated chance of it ever occurring." *Id.; see also In re The Heritage Organization, L.L.C.*, 375 B.R. 230, 284 (Bankr. N.D. Tex. 2007) (stating that the "[C]ourt should multiply the face amount of the asset or liability times the probability that the contingency will occur"); *In re Xonics Photochemical, Inc.*, 841 F.2d 198, 200 (7th Cir. 1988) ("To value the contingent liability it is necessary to discount it by the probability that the contingency will occur and the liability will become real.").

It is well established that "a contingent liability cannot be valued at its potential face amount . . . ." *Nordberg v. Arab Banking Corp. (In re Chase &*

*Sanborn Corp.)*, 904 F.2d 588, 594 (11th Cir. 1990); *see also Oakes v. Spalding (In re Oakes)*, 7 F.3d 234 at *3 (6th Cir. 1993); *Xonics*, 841 F.2d at 200 (contingent liabilities not valued at face amounts, even if no uncertainty about what firm will owe *if* the contingency materializes). If an expert treats contingent liabilities as certainties, his expert opinion will be invalidated.  *Baldi v. Samuel Son & Co., Ltd.*, 548 F.3d 579, 582 (7th Cir. 2008); *see also Bachrach Clothing, Inc. v. Bachrach (In re Bachrach Clothing, Inc.)*, 480 B.R. 820, 862 (Bankr. N.D. Ill. 2012) (failure to discount contingent liability discredits expert's valuation). Moreover, the contingent liability must be valued as of the time of the Transfer, based on information available at that time, and not by using improper hindsight. *See Paloian v. LaSalle Bank*, N.A., 619 F.3d 688, 693 (7th Cir. 2010) ("Hindsight is wonderfully clear, but. . . . Hindsight bias is to be fought rather than embraced.").

Thus, the Court must review the expert testimony through the lens dictated by the Eleventh Circuit. At the time of the Transfer, the Second Romay State Court Litigation had been pending about five months.  Procedurally, the Caribevision Defendants had filed an answer, along with affirmative defenses and counterclaims.  The issues raised by these pleadings were substantial, and the counterclaims significant.  As of the Transfer Date, the Romay Parties' motion to dismiss the counterclaims (which included claims for breach of contract, negligent representation, and intentional misrepresentation) had been rejected by the state trial court and those counterclaims remained pending.  The Romay Parties had filed their answer to the counterclaims; the defenses pending as of the Transfer Date included equitable estoppel, laches, failure to mitigate, waiver,

use of best efforts, and the business judgment rule, all relating to the Auction and withdrawal from the Auction of the Puerto Rico stations, as well as frustration of purpose as to the CSA. As of the Transfer Date, there remained substantial judicial and legal labor required before any trial and final determination of the Second Romay State Court Litigation.

During the Second Romay State Court Litigation, and throughout the time when the Second Romay State Court Litigation complaint was filed and the date of Transfer, management of the Broadcast Businesses, and their shareholders, held extensive discussions about the value of the Second Romay State Court Litigation.  Marcell Felipe wrote many memos analyzing the possible ranges of recovery, from a likely low of about $3 million to a possible high number of around $9 million.  On January 29, 2018, three months before the Transfer Date, Omar Ortega (the Caribevision Defendants' outside litigation attorney) provided the Caribevision Defendants with an initial evaluation of the Second Romay State Court Litigation. Mr. Ortega identified several issues with Romay's claims and alleged damages and expressed confidence in a number of the Caribevision Defendants' defenses. Mr. Ortega continued to believe that the Caribevision Defendants had a "strong position".  Mr. Ortega's assessment was that the claim, if pursued through trial and properly amended, would have a likely value in the range of $300,000.00 to $9.92 million.  He opined that, even if successful, the Romay Parties' claims should not exceed $4.3 million.  Mr. Ortega did not believe there was any theory of damages under which the Romay Parties could recover $21 million, the amount demanded in the Second Romay State Court Litigation complaint.  The evidence shows that around the time of the Transfer, reasonable

settlement ranges for the Second Romay State Court Litigation were between $4 to $6 million, and between $3 to $5 million.   Mr. Felipe's January 1, 2018 assessment concluded that the case could settle between $5 to $6 million. As of the Transfer Date, the Debtor and Affiliated Debtors were aggressively litigating the case, and no decision had been made about the correct interpretation of the CSA. There was no pending motion that would indicate a decision against the Caribevision Defendants was imminent and the comments from the state court seemed to indicate the court favored the Caribevision Defendants' interpretation.

The range of values is consistent with other evidence, including the amounts referenced in various emails between and among Mr. Braun, Mr. Calles, and individuals associated with Pegaso in October 2017 ($4 million settlement), February 2018 ($4 million settlement) and May 2018 ($2.7 million reserve plus payment of one Puerto Rico station). There was evidence that Romay's representatives (Granda and Cainzos) gave the impression that Romay would settle in the range of $3 to $5 million or $4 to $6 million.   *See Advanced Telecomm.*, 490 F.3d at 1339 (Trager, J., concurring) (proffered settlement is best evidence for what liability was worth); *Polis v. Getaways, Inc. (In re Polis)*, 217 F.3d 899, 903 (7th Cir. 2000) (refused settlement normally good evidence of minimum fair value).[18]

Mr. Kapila testified that he did not consult with counsel, did not review the state court docket, and is not familiar with the status of the litigation at the

---

[18] While not liquidated at the time, all parties recognized that the Second Romay State Court Litigation complaint did not include, but the Romay Parties were entitled to assert some interest in, the value of the two unsold Puerto Rico stations.  However, there was no testimony at Trial about including that potential value in any insolvency analysis as of the date of the Transfer.

time of the Transfer.  Rather, using the $21 million demanded in the Second Romay State Court Litigation complaint as a starting point, and based on communications and internal analysis of insiders, as well as the legal analysis of outside counsel, Mr. Kapila determined that the high range of the state court's April 2019 non-final order was an appropriate reflection of the value of the Romay Contingency on the Transfer Date. Conversely, Mr. Feltman testified that in addition to reviewing the same communications, internal analysis of insiders, as well as the legal analysis of outside counsel, he also reviewed the entire state court docket at the time of the Transfer.

The Court considered the expert opinions and methodology of both experts and finds that only Mr. Feltman applied the appropriate framework to value the Romay Contingency.  Mr. Feltman testified as to his substantial experience as a financial advisor to debtors and fiduciaries settling litigation claims and the correct formula for settling or valuing such claims by considering the likelihood of success, the range of damages, the costs of litigation, the time value of money and the existence of other obligors and defense parties.  Mr. Feltman also considered all the evidence presented from his review of the state court docket and the internal correspondence, and outside legal advice, and, based on all those factors, quantified the likelihood of success for the Romay Contingency, as of the Transfer Date, at approximately 35% to 45%, and applied that factor to a reasonable total damages value of $9 million.  This analysis resulted in a value range of approximately $3.15 million to $4.05 million, and a conclusion (for purposes of the balance sheet test) that the Romay Contingency should be valued at $3,600,000.00.  This methodology is consistent with the formula set forth in

*Advanced Telecommunication.* The Court concludes that this value is appropriate, for purposes of valuing the Second Romay State Court Litigation claim, as of the Transfer Date, in the context of the balance sheet test.

Conversely, Mr. Kapila, although also an experienced bankruptcy trustee, did not use the methodology prescribed by *Advanced Telecomm.*, 490 F.3d at 1335, but rather assumed a 100% likelihood of success as of the Transfer Date based, in part, on the non-final order that was ultimately entered in April 2019, with an amount of $9.3 million, as well as the agreed final judgment of June 2020 (based on the Romay Settlement reached in the bankruptcy case). Mr. Kapila did not consider the possibility of a trial at the time of the Transfer, the remaining affirmative defenses, the counterclaims, and the risks of appeal. In addition, Mr. Kapila did not provide any explanation why, in the face of a complete disregard by all insiders and outside litigation counsel of the $21,000,000.00 figure, he, nonetheless, used the $21,000,000.00 as a starting point. *See Chase & Sanborn,* 904 F.2d at 594 (contingent liability cannot be valued at potential face amount). Thus, Mr. Kapila applied his discount without factoring in the status of the litigation at the time of the Transfer, and using an improper initial figure.

Further, placing significant reliance on a non-final order entered one year after the Transfer Date, or upon an agreed final judgment entered more than two years after the Transfer Date, is improperly applying hindsight. *See Paloian*, 619 F.3d at 693. A non-final order, only entered after more than a year of hard-fought litigation, is not an appropriate indicator of value and is not proper evidence of the value of the contingent liability as of a date nearly one year prior

to the order.  Moreover, a negotiated final judgment, entered two years after the Transfer Date, as part of the Romay Settlement focused on preserving an alleged fraudulent conveyance action arising from the Transfer, bears no weight whatsoever.

A contested lawsuit, in its early stages, should be more heavily discounted. The case of *Grigsby v. Carmell (In re Apex Automotive Warehouse, L.P.)*, 238 B.R. 758 , 771–72 (Bankr. N.D. Ill. 1999) is instructive.  *Apex Automotive* involved the valuation of a lawsuit as a contingent asset. *Id.* There, the defendant was contesting a fraudulent transfer claim by arguing the debtor was solvent because the debtor's lawsuit against a third party should be valued as a $12 million asset. The trustee, arguing that the debtor was insolvent, asserted that the contingent asset should be valued at only $2.7 million. The trustee presented evidence that "the lawsuit was only a few weeks old" and "the claims were contested." *Id.* at 772.  The lawsuit in *Apex Automotive* also involved a crossclaim. *Id.*  There was evidence of a $3 million dollar settlement offer and the trustee's expert testified to a present value of $2.7 million. *Id.* The court noted that, on the applicable valuation date, the debtors had no certainty that they would win the suit or how much they could recover.  *Id.*  Because the defendant did not offer any credible evidence of the present value of the litigation, the court ruled in favor of the trustee. *Id.*

Just as in *Apex Automotive*, the Second Romay State Court Litigation was at its very early stages and the claims were highly contested.  The counterclaims against the Romay Parties also increased the likelihood that the Romay Parties would not prevail. Indeed, Mr. Ortega testified that he believed, right up to the

26

April 2019 order, that his valuation would prevail.

The Court finds that Mr. Feltman's expert opinion is the more persuasive, and the only opinion that complies with the Eleventh Circuit criteria set forth in *Advanced Telecommunication*. Therefore, the Court holds that the appropriate value of the Romay Contingency on the Transfer Date was $3,600,000.00.

Based on the foregoing, the Court concludes that as of the Transfer Date, the total value of America CVSG's assets at issue in this case (the broadcast licenses and Pegaso "loan") was at least $6,377,000.00 and the total value of liabilities at issue (the Romay Contingency) was $3,600,000.00.[19] The parties agree that as of the Transfer Date, America CVSG also had $2.9 million in cash. Therefore, America CVSG was solvent with assets exceeding liabilities by at least $5.7 million as of the Transfer Date.[20]

### C.    America CVSG was not left with unreasonably small capital after the Transfer.

The Plaintiff argues that at the time of the Transfer, America CVSG was engaged in a business or transaction for which it was left with unreasonably small capital pursuant to section 548(a)(1)(B)(i)(II).

> Whether a transfer or obligation leaves a debtor undercapitalized is a question of fact to be determined on a case-by-case basis. *Smith v. Litchford & Christopher, P.A. (In re Bay Vista of Va., Inc.),* 428 B.R. 197, 225-26 (Bankr. E.D. Va. 2010). Unreasonably small capital refers to the inability to generate sufficient profits to sustain operations. *Moody v. Sec. Pac. Bus. Credit, Inc.*, 971 F.2d 1056, 1070

---

[19] America CVSG had additional assets and liabilities as of the Transfer Date but the Romay Contingency, the broadcast licenses and the Pegaso loan value are the main drivers of value differences between the parties and are case determinative.

[20] In arguing that America CVSG was insolvent, the Plaintiff points to various affidavits signed by Carlos Vasallo, Marcell Felipe, and Emilio Braun attesting to the insolvency on the Transfer Date of various entities, including America CVSG. The Court puts no weight whatsoever on these affidavits; it is clear to the Court that these affidavits, like the consent judgment, were negotiated documents executed in connection with the Romay Settlement.

(3d Cir. 1992). "Because an inability to generate enough cash flow to sustain operations must precede an inability to pay obligations as they become due, unreasonably small capital would seem to encompass financial difficulties short of equitable [in]solvency." *Id.* "[T]he 'unreasonably small capital' test of financial condition is 'aimed at transferees that leave the transferor technically solvent but doomed to fail.'" *Kipperman v. Onex Corp.*, 411 B.R. 805, 836 (N.D. Ga. 2009) (citations omitted). In determining whether a debtor was left with unreasonably small assets, the Court often is called upon to review a debtor's historic and contemporaneous business activities, relevant market data, the ebb and flow of income and expense over time, the availability of additional capital or lines of credit, the prospect for new business, and a variety of inter-related issues that affect whether the enterprise will continue.

*Mukamal v. Nat'l Christian Charitable Found., Inc. (In re Palm Beach Fin. Partners, L.P.)*, 598 B.R. 885, 890 (Bankr. S.D. Fla. 2019).

The Court finds that America CVSG was not left with unreasonably small capital, but remained viable for a full year after the Transfer Date. America CVSG was a holding company, not an operating company. Its function was to hold the broadcast licenses and receive payment for their use. America CVSG had more than sufficient capital and cash to engage in its normal business operations. America CVSG had no debt owed to unaffiliated, unrelated entities. It had no lines of credit, no mortgage loans, and no business loans to be paid. Its normal "operating" expenses were minimal, and it carried sufficient cash to actually pay all expenses as they became due, and it did so. There was no evidence at Trial of any debts that were unpaid, during the year after the Transfer Date. Where a company, like America CVSG, survives for an extended period of time after the subject transaction, courts will not find that the company had unreasonably low

capital. *See Burtch v. Opus LLC (In re Opus E. LLC)*, 698 Fed. Appx. 711, 715 (3d Cir. 2017).

### D.    The Plaintiff did not meet his burden of proving that America CVSG intended, or believed, that it would incur debts beyond its ability to repay.

The Plaintiff argues that even if America CVSG was not actually insolvent or rendered insolvent as a result of the Transfer, it was equitably insolvent for fraudulent transfer purposes pursuant to section 548(a)(1)(B)(i)(III). Section 548(a)(1)(B)(i)(III) requires a determination of the debtor's subjective intent or belief. *See WRT Creditors Liquidation Trust v. WRT Bankruptcy Litigation Master File Defendants (In re WRT Energy Corp).*, 282 B.R. 343, 414-15 (Bankr. W.D. La. 2001) ("Section 548(a)(1)(B)(ii)(III) … protects future creditors from a debtor who transfers assets with the intent to hide them or impair the debtor's ability to pay debts as they arise or with the belief that inability to pay debts would likely result.") (internal citation omitted).

There was no evidence of any intent or belief that America CVSG would incur debts beyond its ability to repay. America CVSG did not take on any new debt as part of the Transfer and did not purposely intend to take on new debt. America CVSG had no debt and no plan nor need for debt to carry on its business as a license holding company, as part of the overall Broadcast Businesses. The Plaintiff argues that America CVSG could not have reasonably believed it would be able to pay its debts as they matured when, at the time of the Transfer, the claims against America CVSG in the Second Romay State Court Litigation were pending. However, as discussed above, the Second Romay State Court Litigation was highly disputed and not certain, and certainly not imminent. In fact,

America CVSG's accountants specifically determined there was no need for a disclosure of the potential claim.

As to intent, America CVSG took a number of steps to provide for the repayment of potential future debts, including the Romay Contingency. Although there was no formal reserve in America CVSG's books, America CVSG established and held an informal reserve of $2.7 million in cash, for a full year after the Transfer Date. Those funds were not spent, and were available to pay or settle the Romay Contingency, if it became due. In addition, America CVSG understood and discussed other available resources from the other Affiliated Debtors, to pay any claim if and when it were to become due, including direct and indirect assets of the other Caribevision Defendants.

The Court concludes that while America CVSG did not receive reasonably equivalent value for the Transfer, because America CVSG was solvent, was not left with unreasonably small capital, and was not unable to pay debts as they became due as of the Transfer Date, the Plaintiff failed to meet his burden to prove by a preponderance of the evidence that the Transfer was constructively fraudulent.

**<u>Actual Fraud</u>**

Notwithstanding that America CVSG is solvent, the Plaintiff also argues that the Transfer is recoverable because he has established all the elements of his claim that the Transfer was made with actual fraudulent intent, that is, that the Transfer was made with actual intent to hinder, delay, or defraud creditors.

It is the Plaintiff's burden to prove, by a preponderance of the evidence, that "the Debtor made the transfer or incurred the obligation with the actual

intent of hindering, delaying, or defrauding a creditor." *Whitaker v. Volvo Commercial Finance, LLC (In re Gulf Northern Transport, Inc.)*, 323 B.R. 786, 791 (Bankr. M.D. Fla. 2005). The focus is on the fraudulent intent of the Debtor, not the fraudulent intent of the recipient. *See Silverman v. Actrade Capital, Inc.* (*In re Actrade Fin. Techs. Ltd.*), 337 B.R. 791, 808 (Bankr. S.D.N.Y. 2005).[21]

Because determining actual intent can be difficult, the party seeking to establish actual fraudulent intent can rely on badges of fraud. *See Dionne v. Keating (In re XYZ Options, Inc.)*, 154 F.3d 1262, 1271 (11th Cir. 1998). The Eleventh Circuit's non-exclusive list of badges of fraud include:

(1) The transfer was to an insider;
(2) The debtor retained possession or control of the property transferred after the transfer;
(3) The transfer was disclosed or concealed;
(4) Before the transfer was made the debtor had been sued or threatened with suit;
(5) The transfer was of substantially all the debtor's assets;
(6) The debtor absconded;
(7) The debtor removed or concealed assets;
(8) The value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred;
(9) The debtor was insolvent or became insolvent shortly after the transfer was made;
(10) The transfer occurred shortly before or shortly after a substantial debt was incurred; and
(11) The debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

*Id.* at 1272.

The Eleventh Circuit noted that, "[a]lthough the presence of one specific 'badge' will not be sufficient to establish fraudulent intent, the 'confluence of

---

[21] Mr. Felipe testified that Mediaset demanded the Auction Proceeds be paid to them but that statement is contradicted by other evidence, and since the burden of proof is on the Plaintiff, the Court finds that the Plaintiff has not proven that Mediaset made any such demand.

several can constitute conclusive evidence of an actual intent to defraud.'" *Id.* at 1271 n.17 (internal citations omitted).

Acknowledging that there is no direct proof of actual fraudulent intent, the Plaintiff points to several badges of fraud, only two of which give the Court pause – a WhatsApp conversation that took place on April 4, 2018 between Marcell Felipe and Fernando Calles, and testimony regarding discussions about using the America CVSG money to pay Grupo Colte's obligation to Mediaset that occurred about three weeks later, at the time of the Transfer.

On April 4, 2018, Mr. Felipe and Mr. Calles had an extensive WhatsApp discussion about how to protect the assets of, it appears, America CVSG from any creditors who, based on the WhatsApp conversation, would be seeking to collect a judgment.[22] In a lengthy exchange, Mr. Felipe explains how the transfer of funds, which would be used to purchase the assets of America-CV Network, would be "asset protection" and "we get protection against creditors in general".[23] This discussion clearly contemplates that the funds invested in America-CV Network could then be used by America-CV Network to send to Pegaso for the purchase of the Mediaset Shares.  When Mr. Calles questioned the proposed structure - "if an act similar to the one you point out is done, it would be considered what is called an Act in Creditor Fraud, since it is an act that places you in insolvency", Mr. Felipe responded "In this case, the fraudulent conveyance

---

[22] Most of the conversation appears to focus on how the equity in Caribevision would be reallocated once Grupo Colte bought out Mediaset's interest in Pegaso. The actual phrase "collect a judgment" is not used but it is clear from the conversation that is the nature of the concerns about transferring cash out of America CVSG by using the cash to invest in an affiliate – apparently America-CV Network.

[23] The evidence at Trial, primarily through the testimony of Jorge Salas, is that America CVSG was not an operating company, although it did have vendors.

doesn't apply because you will not become insolvent.  You have an asset that is the ownership percentage in the LLC."

Of course, ultimately there was no "purchase" or "investment" by America CVSG in America-CV Network.  Mr. Salas testified that Mr. Vasallo instructed him to wire the funds from America CVSG to Mediaset, and he did so.  Mr. Salas testified that Mr. Vasallo told Mr. Salas it was a loan and so that is how it was listed.  However, Mr. Salas also acknowledged an email from the accountant for the Broadcast Businesses, Mr. Pastor, in which Mr. Pastor advised that, for tax purposes, his tax department advised that the $10,000,000.00 should be treated as a loan to Pegaso from Caribevision rather than a dividend, because any dividend would require a distribution to the Romay Parties as well (since at the time the Romay Parties still held interests in America CVSG).  Mr. Felipe testified at Trial that the booking of the Transfer as a loan was used as a placeholder while negotiations between the shareholders of Caribevision on how to allocate their interests were ongoing.

Although after the Transfer America CVSG continued in its business until the bankruptcy cases were filed, Mr. Felipe acknowledged that once the Transfer occurred, America CVSG did not have enough money to pay the Romay Parties a $5 million settlement.  Mr. Felipe also acknowledged that after the Transfer it would have been harder for the Romay Parties to collect any judgment if they prevailed in the Second Romay State Court Litigation.

Mediaset argues that the evidence at Trial makes clear that America CVSG and its agents believed that there were sufficient assets to pay the Romay Contingency (at least in the amount they estimated was at risk) after the

Transfer, including approximately $2.9 million in cash, the value of the Puerto Rico stations (albeit subject to the acknowledged claims to the latter by the Romay Parties), as well as the assets of other defendants in the Second Romay State Court Litigation.[24] Indeed, when questioned about the WhatsApp conversation and in connection with his question in that conversation about a fraudulent transfer, Mr. Calles testified "to be a fraudulent transfer is when you become insolvent, and here clearly the company was not insolvent, in the sense that it had the licenses, the building, equipment, et cetera, et cetera, et cetera, all of those assets right there. So just because of that reason the company had value. . . So none of these transactions, even if you take out all of the, all of the money or cash, which was not taken out of it, but if you take out the cash of the company, you still had in the company all of these other assets, which had a lot of value."

Mediaset also argues that there is no evidence that the Transfer was made for the purpose of making it more difficult for the Romay Parties to collect any ultimate judgment they might obtain, even though that might be the effect. But Mr. Felipe's statement in the WhatsApp conversation directly contradicts that argument; there is no question that Mr. Felipe recognized, and shared with Mr. Calles, that transferring the cash in America CVSG into another type of tangible asset would make it more difficult to collect by a creditor.[25]

---

[24] As the Court has previously stated, the Court does not put any weight on the affidavits regarding insolvency prepared in connection with the Romay Settlement of the Romay Claim in the bankruptcy cases.

[25] Since, as the Court already found, America CVSG was paying what minor expenses it had as a holding company when and as those obligations became due, presumably the creditors about which Mr. Felipe was most concerned were the Romay Parties.

In reviewing the totality of the circumstances surrounding the Transfer, including consideration of the non-exclusive list of the badges of fraud outlined by the Eleventh Circuit in *XYZ Options,* the Court finds that the Plaintiff has not satisfied his burden of proof to demonstrate there was an actual intent to defraud creditors at the time of the Transfer.

There is no question that at the time of the Transfer America CVSG had been threatened with a lawsuit, indeed, it (along with other defendants) had already been sued and the Second Romay State Court Litigation was pending. There is also no question that, while Mediaset's sale of its Shares in Pegaso pre-dated the Transfer, the Transfer was being considered in connection with that sale. Finally, there is no question that the intent of the Transfer was to make it harder for creditors to collect any judgment against America CVSG. However, there is also no question that the Transfer was not the only source of payment for any potential judgment that the Romay Parties might obtain in the Second Romay State Court Litigation, at least in the amount that the Caribevision Defendants estimated at that time. The Second Romay State Court Litigation, as well as the Romay Claim filed by the Romay Parties in the bankruptcy cases, asserted claims, jointly and severally, against America CVSG and two of the Affiliated Debtors – Caribevision and Caribevision Network. If the Romay Parties were ultimately successful, the assets of all the Caribevision Defendants would be subject to execution to satisfy any successful claim against the Caribevision Defendants. Those assets included equity of $4 to $5 million in the real estate and headquarters building held by Orly, which was wholly owned by Caribevision Network, the ongoing Broadcast Businesses and broadcast equipment, the

studios, and the FCC licenses. While the assets of these defendants might have been more difficult to liquidate, the nature of those assets was unchanged up through the time of the bankruptcy filings.

While the Court has already found that America CVSG did not receive reasonably equivalent value for the Transfer, the Court has also determined America CVSG was solvent at the time of the Transfer, that America CVSG did not become insolvent shortly after the Transfer was made, and that the Transfer did not leave America CVSG with unreasonably small capital to pay its obligations. The Transfer was not a transfer of substantially all of America CVSG's assets – it still owned five broadcast stations at the time of the Transfer, the values of which have already been addressed in this opinion, and held $2.9 million in cash. Moreover, the Court finds that the Transfer was not to an insider of America CVSG.  The Bankruptcy Code defines "insider" in 11 U.S.C. §101(31), and Mediaset does not meet that description.

The other "badges" on which the Plaintiff relies all occurred at or near the time of the bankruptcy petitions being filed, a time in which all potential fraudulent transfers are being considered. Regardless of this Court's ruling, there is no question that the Transfer is one that the Debtor's and Affiliated Debtors' attorneys would have looked at at the time of filing. Moreover, the evidence (letters, billing entries, and emails) is, at best, ambiguous with respect to whether the Transfer was the focus of the discussions or emails, or was just one of several possible sources of Chapter V recoveries considered with counsel.

The evidence does not support a finding of actual intent to hinder, delay or defraud a creditor.  The only "badge" of fraud this Court finds to be present is

that the movement of cash out of America CVSG, however it was accomplished, was being considered as a way to make collection of any debt of America CVSG more challenging.  But the presence of that one "badge" does not satisfy the Eleventh Circuit test for finding actual intent. Accordingly, Plaintiff did not meet his burden of demonstrating the Transfer was actually fraudulent by a preponderance of the evidence.

## **Recovery of Transfer**

Because the Plaintiff has failed to show that the Transfer was avoidable, the Plaintiff cannot recover the Transfer from Mediaset under section 550.

## **CONCLUSION**

Based on the foregoing Findings of Fact and Conclusions of Law, it is

**ORDERED** and **ADJUDGED** as follows:

1.     Defendant Mediaset is entitled to judgment in its favor as to all three counts of the Adversary Complaint (ECF #1).

2.     Defendant's counsel shall upload for entry a separate final judgment consistent with this memorandum opinion pursuant to Rule 9021 of the Federal Rules of Bankruptcy Procedure.

3.     The Court reserves jurisdiction to consider an application for attorneys' fees and costs, if any.

###

Copies to:
Patricia A. Redmond, Esq.
Monique D. Hayes, Esq.

*Attorney Redmond is directed to serve a copy of this Order on interested parties who do not receive service by CM/ECF, and file a proof of such service within two (2) business days from entry of the Order.*